IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **WESTFIELD BANK, FSB**<br>4940 Enterprise Parkway<br>Seville, Ohio 44273<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>**AL KASH INSURANCE AGENCY, INC.**<br>23275 South Pointe Drive<br>Laguna Hills, CA 92653<br><br>　　　　Defendant. | **CASE NO. 1:25-cv-783**<br><br>**JUDGE**<br><br>**COMPLAINT FOR MONEY DAMAGES** |

Plaintiff Westfield Bank, FSB ("Plaintiff" or the "Bank"), by and through its undersigned counsel, for its complaint against Defendant Al Kash Insurance Agency, Inc. ("Defendant" or "Agent," and together with Plaintiff, the "Parties"), alleges as follows:

## PARTIES

1. Plaintiff is a federally chartered bank with its principal place of business at 4940 Enterprise Parkway, Seville, Ohio 44273.

2. Defendant is a California corporation that operates an insurance agency with a principal place of business at 23275 South Pointe Drive, Laguna Hills, California 92653.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states, as Plaintiff is a citizen of Ohio and Defendant is a citizen of California, and the amount in controversy exceeds $75,000.

4. Venue is appropriate in this Court, and this Court has personal jurisdiction over Defendant, because, pursuant to section 23 of the Agreement (defined below), Defendant agreed that, at Plaintiff's election, any and all disputes arising out of the Agreement would be

commenced in the state or federal courts located in Medina County, Ohio, and irrevocably submitted to the jurisdiction of the state or federal courts located in Medina County, Ohio.

## BACKGROUND

I.     **THE AGREEMENT.**

5. On or about September 16, 2024, the Parties entered into that certain Westfield Bank Premium Finance Referral Agreement (the "Agreement"). A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

6. Pursuant to the Agreement, Defendant agreed to refer customers desiring to finance insurance policies procured by Defendant to Plaintiff to arrange for financing pursuant to separate premium finance agreements by and between Plaintiff and the applicable customer. *See* Ex. A § 6(a).

7. In the event Plaintiff decided to issue a quote to finance any such policies, Defendant then agreed to facilitate the exchange of information between the applicable borrower-insured and Plaintiff and arrange for execution of the necessary financing documentation by the borrower-insured. *See* Ex. A § 6(b)-(d).

8. Defendant further agreed that, if Plaintiff ultimately agreed to finance premiums for policies obtained by any borrowers that were referred by Defendant, and Plaintiff ultimately advanced any such premiums to Defendant, Defendant would immediately remit all returned or credited unearned premiums and any related commissions relating to such policy to Plaintiff following the termination or cancellation of the applicable policy. *See* Ex. A § 6(e).

9. Pursuant to the Agreement, Defendant also made a number of representations and warranties to Plaintiff regarding the underlying insurance policies and borrowers, including that the "Policies are in full force and effect and the premiums indicated are correct for the term of

the Insurance Policies and all other information relating to the Insurance Policies and the Insured is complete and correct." *See* Ex. A § 9(e).

10. Defendant also agreed to indemnify Plaintiff for all claims, damages, liabilities, losses, and expenses, including attorneys' fees, arising out of or relating to any breach of the Agreement, including any representation or warranty therein, any negligent acts or omissions arising out of the Agreement, or Defendant's failure to comply with any governmental law, statute, ordinance, administrative order, rule or regulation affecting the Agreement. *See* Ex. A § 13.

## II. THE BORROWERS, THE POLICIES, AND THE PFAS.

11. Plaintiff ultimately issued a number of loans (each, a "Loan," and collectively, the "Loans") to finance premiums under insurance policies (each, a "Policy," and collectively, the "Policies") that were purportedly obtained by a number of borrowers (each, a "Borrower," and collectively, the "Borrowers") that were referred to Plaintiff by Defendant pursuant to the Agreement and separate premium finance agreements (each, a "PFA," and collectively, the "PFAs") issued by Plaintiff and executed by Borrowers and Defendant between September 19, 2024 and January 15, 2025, as follows:

    a) On or about September 19, 2024, Plaintiff issued a PFA with Millenia Aero Corp. ("Millenia"), providing for a Loan in the original amount of $253,965.76.

    b) On or about October 1, 2024, Plaintiff issued a PFA with P Silva & Son Inc., providing for a Loan in the original amount of $212,998.82.

    c) On or about October 3, 2024, Plaintiff issued a PFA with CEM Transport Inc., providing for a Loan in the original amount of $145,272.75.

    d) On or about October 8, 2024, Plaintiff issued a PFA with Alpha Brothers Logistics LLC, providing for a Loan in the original amount of $214,772.91.

  e)  On or about October 15, 2024, Plaintiff issued a PFA with DB Trucking Inc., providing for a Loan in the original amount of $144,459.65.

  f)  On or about October 18, 2024, Plaintiff issued a PFA with Trucker Transport LLC, providing for a Loan in the original amount of $145,311.46.

  g)  On or about November 14, 2024, Plaintiff issued a PFA with Musa Logistics, Inc. ("**Musa**"), providing for a Loan in the original amount of $351,269.07.

  h)  On or about December 19, 2024, Plaintiff issued another PFA with Musa, providing for a Loan in the original amount of $184,299.34.

  i)  On or about December 23, 2024, Plaintiff issued a PFA with Camel Logistics & Trucking Inc., providing for a Loan in the original amount of $129,420.00.

  j)  On or about January 6, 2025, Plaintiff issued another PFA with Millenia, providing for a Loan in the original amount of $129,991.32.

  k)  On or about January 15, 2025, Plaintiff issued a PFA with US & W Trucking Inc., providing for a Loan in the original amount of $134,673.75.

12. True and correct copies of each of the foregoing PFAs are attached hereto as **Exhibit B** through **Exhibit L**.

13. Each of the PFAs generally required the applicable Borrower to make set monthly installment payments to Plaintiff to repay the Loan.

14. Pursuant to each of the PFAs, the applicable Borrower also assigned and granted to Plaintiff a security interest in any and all unearned premiums and dividends which may become due and payable under the applicable Policy. The Borrowers also irrevocably appointed Plaintiff as their Attorney-In-Fact with the full authority to cancel the underlying Policy if the Borrower failed to make any Loan payment under the PFA or failed to comply with other terms of the PFA.

15. The PFAs also generally obligate the applicable Borrower to pay a late charge for any delinquent payments, and permit Plaintiff to recover all of its costs and expenses, including

reasonable attorneys' fees, incurred as a result of Plaintiff's enforcement of the PFA upon the Borrower's default.

16. Under the PFAs, Defendant represented and warranted, among other things, that: (i) the "policies hereon are in full force and effect and the information in the schedule of policies and the premiums are correct"; (ii) that "the Borrower has authorized this transaction and recognizes the security interest assigned herein"; and (iii) "to hold in trust for Lender [Plaintiff] any payments made or credited to the Borrower." *See* Exs. B-L, page 1 of PFAs.

17. In reliance on the representations and warranties in the Agreement and PFAs, the Plaintiff then advanced the premiums financed by Plaintiff under the Loans to the Defendant to be remitted to the applicable insurance carriers (collectively, the "Carriers").

18. Collectively, the total aggregate amount of the foregoing Loans issued by Plaintiff to the Borrowers, which were referred to Plaintiff by Defendant under the Agreement, is $1,474,912.54.

**III. DEFENDANT BREACHES THE AGREEMENT AND THE PFAS.**

19. In January 2025, Plaintiff's representatives discovered that certain monthly payments for some of the Loans were being made by credit cards in the name of the Defendant and not by the Borrowers directly to the Plaintiff as the Plaintiff would usually see for repayment of premium finance loans.

20. As a result, Plaintiff's representatives contacted certain of the applicable Carriers and insurance brokers (collectively, the "Brokers") to gather more information regarding the Borrowers and the Policies, including inquiring as to whether the premiums that were ultimately financed by Plaintiff pursuant to the Loans were ever actually paid to the Carriers and whether the corresponding Policies were ever issued and bound.

21. Plaintiff's representatives discovered that, of the total Loans issued by Plaintiff to the Borrowers, only Policies to Borrowers Musa and Millenia were issued and bound by the applicable Carriers.

22. From February through March of 2025, each of the purported Borrowers other than Musa and Millenia then failed to make the required monthly payments that were due and owing on their respective Loans under the applicable PFA. The failure to make these payments constituted an event of default under each of the corresponding PFAs. As a result, Plaintiff issued notices of cancellation for the corresponding Policies to the applicable Carriers.

23. On or about March 7, 2025, a representative of Plaintiff then contacted Al Kash—Defendant's principal—to inquire about the Loans for which Policies had apparently not been issued by the respective Carriers, and the status of the premiums that had been financed by Plaintiff and advanced to Defendant. Mr. Kash failed to provide any explanation for what happened.

24. Thus, on or about April 10, 2025, Plaintiff, through counsel, provided notice to Defendant that it was in default of its obligations under the Agreement and the PFAs, and demanded immediate payment of the full outstanding balance of the foregoing Loans, which totaled $842,155.43 (the "April 10 Notice"). A true and correct copy of the April 10 Notice is attached hereto as **Exhibit M**.

25. The same day, Mr. Kash contacted Plaintiff's representatives and acknowledged receipt of the April 10 Notice. Mr. Kash asked that Plaintiff not contact any of the applicable Carriers or Brokers to coordinate the return of unearned premium that was due and owing on the Policies financed by Loans that were purportedly obtained by Musa and Millenia. Instead, Mr. Kash requested that Plaintiff permit those premiums to be routed through Defendant.

26. On April 14, 2025, a representative of Plaintiff contacted the Broker for the Policies obtained by the Musa and Millenia Borrowers. The Broker confirmed that, while the applicable Policies had been issued to Musa and Millenia, the corresponding premiums had not been paid by the Loans obtained from Plaintiff, but instead from a different premium finance lender. The Broker explained that it appeared that Defendant and Mr. Kash had been obtaining premium finance loans for the same Policies and Borrowers that Plaintiff financed, but with other premium finance companies.

27. In light of the foregoing, on April 16, 2025, Plaintiff, through counsel, sent an additional notice (the "April 16 Notice") to Defendant that it continued to be in violation of its obligations under the Agreement, and this time demanding immediate payment of the full outstanding balance of all of the Loans, to include the Musa and Millenia Loans, totaling $1,472,743.75 (the "Balance").

28. After receiving no response, Plaintiff sent additional correspondence to Defendant on April 17, 2025. A true and correct copy of this correspondence is attached hereto as **Exhibit N**.

29. To date, Defendant has failed to repay the outstanding Balance under the Loans in response to the April 10 Notice and the April 16 Notice.

## COUNT ONE – BREACH OF CONTRACT

30. Plaintiff restates the prior allegations as if fully set forth herein.

31. Plaintiff entered into valid and enforceable contracts with Defendant, evidenced by the Agreement and the PFAs.

32. At all times, Plaintiff performed and fulfilled all of its obligations under the Agreement and the PFAs, including by funding the Loans for the Borrowers that were referred to Plaintiff by Defendant.

33. Pursuant to section 9(e) of the Agreement, Defendant represented and warranted that each of the "Policies are in full force and effect and the premiums indicated are correct for the term of the Insurance Policies and all other information relating to the Insurance Policies and the Insured is complete and correct." *See* Ex. A § 9(e).

34. Under the PFAs, Defendant represented and warranted, among other things, that: (i) the "policies hereon are in full force and effect and the information in the schedule of policies and the premiums are correct"; (ii) that "the Borrower has authorized this transaction and recognizes the security interest assigned herein"; and (iii) "to hold in trust for Lender [Plaintiff] any payments made or credited to the Borrower." *See* Exs. B-L, page 1 of PFAs.

35. Defendant breached the foregoing representations and warranties by, among other things, failing to remit the premiums financed by Plaintiff under the Loans and advanced to Defendant to the applicable Carriers, thereby resulting in the Carriers failing to issue and bind the applicable Policies.

36. Defendant further breached the Agreement by failing to promptly remit any returned or unearned premiums to Plaintiff relating to the Policies even though they were never issued, or following their cancellation, in accordance with section 6(e) of the Agreement.

37. As a result of the foregoing breaches, Defendant is obligated to indemnify Plaintiff for the Balance, along with any other claims, damages, liabilities, losses, and expenses, including attorneys' fees, incurred by Plaintiff in connection with the foregoing violations of the Defendant, pursuant to section 13 of the Agreement.

38. As of April 17, 2024, the outstanding Balance due to Plaintiff under the Agreement is $1,472,743.75, together with interest, default charges and the reasonable attorneys'

fees and expenses incurred by Plaintiff in connection with its enforcement of the Agreement, including the attorneys' fees incurred by Plaintiff in bringing this action.

39. Accordingly, Defendant's breach of the Agreement directly and proximately caused Plaintiff damages in the amount of $1,472,743.75, together with interest, default charges and the reasonable attorneys' fees and expenses incurred by Plaintiff in connection with its enforcement of the Agreement, including the attorneys' fees incurred by Plaintiff in bringing this action, which remain unpaid and due.

*[Remainder of page intentionally blank]*

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff against Defendant, in an amount to be proven at trial, but for no less than $1,472,743.75, together with interest, default charges and the reasonable attorneys' fees and expenses incurred by Plaintiff in connection with its enforcement of the Agreement, and for such other relief as the Court deems just and proper.

      */s/ James R. Bedell*
Andrew G. Fiorella (0077005)
James R. Bedell (0097921)
**BENESCH, FRIEDLANDER, COPLAN &**
  **ARONOFF LLP**
127 Public Square, Suite 4900
Cleveland, Ohio 44114-2378
Telephone: 216.363.4500
Facsimile: 216.363.4588
Email: afiorella@beneschlaw.com
       jbedell@beneschlaw.com

-and-

Kevin M. Capuzzi (*pro hac vice* forthcoming)
Steven L. Walsh (*pro hac vice* forthcoming)
**BENESCH, FRIEDLANDER, COPLAN &**
  **ARONOFF LLP**
1313 N. Market St., Suite 1201
Wilmington, Delaware 19801
Telephone: 302.442.7010
Facsimile: 302.442.7012
Email: kcapuzzi@beneschlaw.com
       swalsh@beneschlaw.com

*Attorneys for Plaintiff Westfield Bank, FSB*